**CUYLER BURK, P.C.**
Parsippany Corporate Center
Four Century Drive
Parsippany, N.J.  07054-4663
(973) 734-3200
Attorneys for Plaintiff, Xantel, Inc.
By: David L. Menzel, Esq. (DLM-7314)

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| XANTEL, INC., <br><br>          Plaintiff, <br><br> vs. <br><br> MERCK & CO., INC., <br><br>          Defendant. | Civil Action No. <br><br><br> **COMPLAINT** |

Plaintiff, Xantel, Inc., by way of complaint against the Defendant, Merck & Co., Inc., says that:

## THE PARTIES

1.   The Plaintiff, Xantel, Inc. ("Xantel") is a corporation of the State of Minnesota, with a principal place of business at 500 East Travelers Trail, Suite 100, Burnsville, Minnesota  55337.

2.   The Defendant, Merck & Co., Inc. ("Merck")is a corporation of the State of New Jersey with its principal place of business at One Merck Drive, Whitehouse Station, Hunterdon County, New Jersey 08889-0100.

**JURISDICTION AND VENUE**

3. There is complete diversity of citizenship between the parties.

4. The amount in controversy is in excess of $75,000.

5. This Court has jurisdiction pursuant to 28 U.S.C. § 1332.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

**FACTS**

7. Xantel is a successor in interest to Dun & Bradstreet Software Services, Inc. ("DBSS") with respect to ownership of the entire right, title and interest in a certain family of manufacturing resource planning software systems generally known as "Advanced Manufacturing Accounting Production System" ("AMAPS").  Xantel is also the successor-in-interest to licensing agreements by which third party licensees were authorized by DBSS, or its predecessors, to use one or more of various versions of these systems and documentation.

8. The AMAPS family of manufacturing resource planning systems was originally developed by Comserv Corporation ("Comserv") in the 1970s.

9. On or about February 17, 1987, MSA Holdings, Inc. was merged with Comserv, with the surviving corporation known as MSA Advanced Manufacturing, Inc.

10. On or about December 15, 1989, MSA Advanced Manufacturing, Inc. was merged into Management Science America, Inc. (GA).

11. On or about January 15, 1990, Management Science America, Inc. (GA) merged into DBC Acquisition Corp., with the surviving corporation known as Management Science America, Inc. (GA).

12. On or about March 1, 1990, Management Science America, Inc. (GA) changed its name to Dun & Bradstreet Software Services, Inc.

13. On or about October 31, 1996, GEAC Computer Corporation Limited (Toronto) acquired DBSS and changed its name to GEAC Computer Services, Inc. (GA).

14. By License Agreement dated February 29, 1996, DBSS granted Xantel exclusive rights in the United States and other countries to modify, market, sublicense, support and maintain proprietary software programs, and components thereof, known as AMAPS and AMAPS/Q for the IBM platform, and AMAPS/3000 for the HP3000 platform.

15. On or about November 11, 1997, Xantel exercised its option to purchase the foregoing systems and components thereof and is now the owner of those systems and component programs.

16. As a result of the foregoing, Xantel is the successor in interest with respect to the AMAPS programs, documentation and licensing agreements for the AMAPS system between Comserv

and its successors-in-interest and licensees of their families of AMAPS products.

17.  On or about June 11, 1981, Comserv entered into a licensing agreement with Plough, Inc. ("Plough") with respect to AMAPS.

18.  Schering-Plough Corp. ("Schering-Plough") was the successor by merger with Plough, Inc.

19.  On or about June 25, 1990, DBSS entered into a License Agreement (the "1990 Agreement") with Schering-Plough pursuant to which DBSS provided various modules and upgrades updating the software system provided under the 1981 agreement between Comserv and Plough.  The resulting software system and products, as updated, is hereinafter referred to as the "System."

20.  The 1990 Agreement expressly provides that:

> [T]hose portions of all prior agreements and understandings relating to any version of the System, including but not limited to such portions of Limited Site Software Product License Agreement #S75-LS03 between Plough, Inc. ("Customer's Predecessor") and Comserv Corporation("Comserv"), DBS's predecessor in interest, dated June 11, 1981 as amended, relating to Customer's use of the System (said prior agreements referred to as the "old agreements") are superceded in their entirety and shall be of no further force or effect except as expressly provided for herein.

21.  The 1990 Agreement further provides that:

> Customer shall not assign, sublicense, extend, or transfer its right under this agreement by operation of law or otherwise.  Customer shall have sole responsibility for the propriety,

4

confidentiality, and use of the data maintained by the Systems.

22. The 1990 Agreement further provides that Schering-Plough was permitted to make copies of the Software (as defined therein), but solely for testing, archival and back-up purposes, and required Schering-Plough to ensure any proprietary, copyright or trade secret notices contained or placed on the System would appear on any copies.

23. Further, the 1990 Agreement provides:

> **CONFIDENTIALITY.** Customer shall not disclose, provide, or otherwise make available to any third party, in whole or in part, the Systems or any information relating thereto, this Agreement, or any confidential material of DBS (or its licensors) except in confidence to employees of Customer and its Subsidiaries to enable Customer to use the Systems.  Customer shall take all reasonable action to fulfill its obligations with respect to the use, copying, confidentiality, and security of the Systems and all other confidential material of DBS or its licensors.

24. The 1990 Agreement further provides that upon termination thereof the Customer shall return the System and destroy all copies and certify that all copies were destroyed.

25. The 1990 Agreement provides that the Customer shall be responsible for all costs, including reasonable attorneys fees, incurred by DBSS in enforcing it.

26. The 1990 Agreement recites that it is governed by the laws of the State of Georgia.

27. AMAPS software typically constitutes a core element of a licensee's manufacturing operation. It is a set of computer programs that enable a licensee to coordinate its entire manufacturing production for each of its products, including (depending on the licensee's needs): a bill of the materials for manufacture of the product; inventory for the materials used to manufacture the product; when a product should be manufactured; employees needed to produce the product; start and end date for the manufacture of the product; costs; inventory of finished product; and shipping dates. In sum, AMAPS schedules all events within an organization to produce a product within a scheduled completion date. The software also tracks batches in the event of product recall.

28. Xantel and its predecessors-in-interest, as the case may be, continuously upgraded and expanded their AMAPS products since its initial development in the 1970s, up to the present date.

29. Xantel's AMAPS products are essential to the business of Xantel, as they are its only line of products.

30. Xantel has expended substantial resources to continuously upgrade and develop its AMAPS product line.

31. Xantel vigorously maintains the confidentiality and secrecy of its AMAPS products.

32. Xantel has vigorously enforced the limitations in its licensing agreements for use of the AMAPS products by licensees.

## COUNT I

33.  It repeats paragraphs 1 through 32 as though more fully stated at length herein.

34.  Schering-Plough had the right to elect to have Xantel maintain the System, at an additional cost.

35.  Since approximately 1988, Schering-Plough elected to have its own employees maintain the System.

36.  Service of the System by Schering-Plough's own employees was permissible under Section 7 of the Agreement.

37.  Schering-Plough terminated all or some of its employees who had been servicing the System.

38.  The former Schering-Plough employees who had serviced the System were hired International Business Machines Corporation or one of its subsidiaries or affiliated companies (collectively, "IBM").

39.  Without notice to or permission by Xantel, the System was then exposed to and has since been maintained by IBM.

40.  Exposure of the System to third parties such as IBM will irreparably harm Xantel.

41.  IBM has historically offered three products that directly competed with the AMAPS product line.  While IBM currently does not offer a competing product, it has the ability to re-enter the field.  Exposure of the System to IBM provides IBM with an unfair competitive advantage.

42. On or about September 1, 2009, Xantel advised Schering-Plough that maintenance of the System by IBM was a violation of the 1990 Agreement.

43. Notwithstanding Xantel's notice to Schering-Plough of its violation of the 1990 Agreement, the violation continued and persists to this day.

44. On or about December 4, 2009, Xantel gave notice to Schering-Plough of termination of the 1990 Agreement.

45. Defendant Merck is successor by merger with Schering-Plough.

46. Merck has not returned the System and continues to use it to this day.

47. Schering-Plough breached and Merck has breached and continues to breach the 1990 Agreement by exposing and continuing to expose the System to IBM, and by its refusal to abide by the termination provisions of the 1990 Agreement.

Wherefore, Xantel demands judgment against Merck:

a. Declaring that Merck is in breach of the 1990 Agreement and that the 1990 Agreement is terminated;

b. Directing return of the System, and destruction of any copies of the System;

c. For damages;

d. For costs of suit, interest and reasonable attorneys fees; and

e. For such other relief as the Court may deem right and just.

## COUNT II

48. It repeats paragraphs 1 through 47 hereof as though set forth more fully at length herein.

49. The 1990 Agreement expressly precludes transfers of the license granted thereby, including transfers by operation of law.

50. The transfer of the 1990 Agreement to Merck by merger is a violation of the 1990 Agreement.

51. Xantel has never consented to the transfer of the 1990 Agreement to Merck.

Wherefore, Xantel demands judgment against Merck:

a. Declaring that Merck is in breach of the 1990 Agreement and that the 1990 Agreement is terminated;

b. Directing return of the System, and destruction of any copies of the System;

c. For damages;

d. For costs of suit, interest and reasonable attorneys fees;

e. For such other relief as the Court may deem right and just.

## COUNT III

52. It repeats paragraphs 1 through 51 hereof as though fully stated at length herein.

53. The System and its component features derive economic value from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from their disclosure or use, and are the subject

of efforts that are reasonable under the circumstances to maintain their secrecy.

54. The System and its component features are "trade secrets" as defined by Georgia law, GCA §10-1-761(4).

55. Merck's exposure of the System to IBM, and its continued use of the System after termination of the 1990 Agreement, is a misappropriation of Xantel's trade secrets under Georgia law, GCA §10-1-76 et seq. in that it has disclosed the System to IBM without Xantel's consent and, at the time of disclosure, knew that knowledge of the trade secrets was derived from or through a person who owed a duty to Xantel to maintain their secrecy and/or limit their use.

56. Merck's continued exposure of the System to IBM with knowledge that the exposure violated the 1990 Agreement was willful and malicious.

Wherefore, Xantel demands judgment against Merck:

a. For injunctive relief precluding further disclosure by Merck to IBM or any other third parties;

b. For injunctive relief requiring return of the System and destruction of any copies;

c. For damages pursuant to CCA § 10-1-763(a);

d. For exemplary damages pursuant to CCA § 10-1-763(b)

          **CUYLER BURK, P.C.**
          Attorneys for Plaintiff,
          Xantel, Inc.

Dated: May 21, 2010   By: *s/David L. Menzel*
           David L. Menzel